## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARLENE FRICCHIONE AND DAGMAR HOFF-DAVIS,<br><br>Plaintiffs,<br><br>*v.*<br><br>AIRBUS AMERICAS, INC. AND AIRBUS S.A.S.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No: 1:26-cv-671

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Darlene Fricchione and Dagmar Hoff-Davis, by and through their attorneys, file this Complaint against Defendants Airbus Americas, Inc. and Airbus S.A.S. (hereinafter collectively referred to as "Airbus" or "Defendants") and state as follows:

## PARTIES

1.     Plaintiff Darlene Fricchione is domiciled and a resident of Middle Island, New York.

2.     Plaintiff Dagmar Hoff-Davis is domiciled and a resident of Deer Park, New York.

3.     At all times relevant to the claims herein, Plaintiffs were employed as flight attendants by United Airlines.

4.     Defendant Airbus Americas, Inc. is a Delaware corporation with its principal place of business in Herndon, Virginia. Airbus Americas, Inc. designs, produces, manufactures, delivers, and services commercial aircraft to customers in the United States, acts as a U.S. customer representative for Airbus S.A.S., and interfaces with U.S. governmental authorities on matters such as the safety issues that are the subject of this lawsuit. Airbus Americas is responsible for the design

of, among other things, aircraft cabins. In this regard, Airbus Americas has or had an office in the FAA building. Airbus Americas is a wholly owned direct subsidiary of Airbus S.A.S.

5.      On information and belief, Airbus Americas began performing the final assembly of Airbus aircraft sold in America in Mobile, Alabama, as well as aircraft revisions, in September 2015, in addition to its other roles as a subsidiary for Airbus S.A.S.

6.      Prior to 2018, Airbus Americas Engineering, Inc. designed aircraft components in Mobile, Alabama, and Wichita, Kansas. AA Engineering was merged into Airbus Americas on December 31, 2017.

7.      Defendant Airbus S.A.S. is a French corporation with a principal place of business in Toulouse, France. Airbus S.A.S. designs, manufactures, assembles, services, and sells civil commercial aircraft, including the Airbus A320 family aircraft (including the Airbus A319, A320, A321 and variants of each) to customers in the United States and across the world.

8.      Airbus S.A.S. holds the type certificate for all aircraft in the A320 family (which includes the A318, A319, A320, and A321 as well as several variants of those aircraft) and is responsible for the design, certification, and continued airworthiness of the A320 family aircraft.

9.      As the type-certificate holder, Airbus S.A.S. writes, publishes, and updates the operations, training, and maintenance manuals for the Airbus A320 family aircraft, including the subject aircraft involved in the cabin air event that is the subject of this litigation.

10.     With regard to cabin air events and cabin fumes, all research and development, or the lack thereof, of technical solutions was carried out at the direction of Airbus S.A.S.

11.     On information and belief, Airbus Americas was involved in interfacing with North American customers as well as the FAA regarding the research and development, or lack thereof, of technical solutions regarding cabin air events or cabin fumes.

12.    To the extent that any warnings or instructions exist for the A320 family of aircraft, the responsibility to publish and update resides with Airbus S.A.S., but on information and belief, Airbus Americas, as Airbus S.A.S.'s North American representative, interfaces with and communicates to North American customers and the FAA regarding these subject matters.

13.    Airbus S.A.S. initially developed the specifications for the component parts of the A320 aircraft, including the Subject Aircraft and its ECS (Environmental control system), bleed air system, engine, and APU (auxiliary power unit). It also oversaw the procurement process for those components.

14.    Airbus S.A.S. is responsible for the specification and initial installation of the APU, APU components, bleed air system (including related components) and whether to include new or different components, including sensors, alarms or ozone converters and for APU components that are not supplied by third parties, Airbus S.A.S. is responsible for deciding whether or how to modify the components.

15.    Airbus S.A.S. manufactured the ECS components or sourced them.

16.    Airbus S.A.S. provides manuals, including training, aircraft maintenance and other manuals for the A320 family aircraft.

17.    With regard to activities described in paragraphs 13-17, on information and belief, Airbus Americas assists Airbus S.A.S. in interfacing with and assisting North American operators such as United Airlines.

18.    Before September 2015, Airbus Americas operated principally as a marketing subsidiary for Airbus S.A.S., focusing on operators in the U.S. but also those based throughout North America.

19.    In September 2015, Airbus Americas began performing final assembly of certain Airbus aircraft in Mobile, Alabama, in addition to other roles as a subsidiary for Airbus S.A.S.

20.    The Subject Aircraft that caused plaintiffs' injuries was manufactured and delivered by Airbus S.A.S. before September 2015 but, as alleged above, Airbus Americas was involved in the marketing of the A320 family of aircraft to North American customers such as United Airlines, the operator of the subject aircraft.

21.    On information and belief, Airbus Americas, as Airbus S.A.S.'s North American representative, interfaces with North American customers such as United Airlines on an ongoing basis.

22.    On information and belief, Airbus Americas, as the representative of Airbus S.A.S. with regard to interfacing with the FAA, was a participant in activities that misleadingly minimized the problems with cabin air events in the A320 aircraft to operators of the A320 aircraft such as United Airlines, as well as the FAA, and has stymied efforts to adequately and meaningfully study the cabin air problem caused by bleed air events.

23.    As detailed further herein, Plaintiffs were injured while working onboard an Airbus 319 aircraft, tail number N899UA and serial number 3342 ("Subject Aircraft"). Upon information and belief, the Subject Aircraft was initially designed, manufactured, and assembled by Airbus S.A.S., was delivered to ILFC (International Lease Finance Corporation), and ultimately leased to United Airlines pursuant to a leasing contract between United Airlines and AerCap, the successor to ILFC.

24.    Notwithstanding, both Airbus defendants are responsible for ensuring that the A320 family aircraft remain safe for passengers and crews of entities that operate said planes in North America, and in this regard both have a duty to ensure that said aircraft are free of defects in design,

and both are responsible to warn passengers and crews flying or operating these aircraft of defects during the lifetime of the aircraft.

25.     The Airbus Defendants have held themselves out publicly as a single entity operating together, including by often referring to themselves as "Airbus" in their advertising, public website, and social media.

26.     Nonparty United Airlines, Inc. ("United"), is a Delaware corporation, headquartered in Chicago, Illinois.

## JURISDICTION AND VENUE

27.     Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are citizens of New York, Defendant Airbus Americas is a citizen of Virginia and Delaware, and Defendant Airbus SAS is a citizen of France. Defendants have agreed to accept service in this matter as long as this matter is filed in this Court.

28.     The Airbus defendants have repeatedly availed themselves of the laws of the United States in that, on information and belief, they agree to be subject to the laws of the state of New York in their sales and lease agreements with airlines such as United Airlines. In light of the tolling agreement, Defendants have agreed to waive any objections to venue or personal jurisdiction.

29.     Pursuant to purchase agreements with various airlines, Defendants derive substantial revenue from business in the United States, including New York, such that the requirements for general and or specific jurisdiction, together with the requisite minimum contacts, are satisfied. Defendants purposefully directed and purposefully conducted activities within the State of New York.

30.     At all times relevant to this complaint, Defendants were engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing, and selling commercial aircraft, as well as providing information regarding maintenance, ongoing or

developing safety issues and safety warnings about commercial airplanes, including the aircraft at issue in this case.

31.     Defendants, at all times material hereto, assumed all responsibility for providing inspection, repair, service, maintenance, replacement, overhaul, warnings, parts, instructions, maintenance manuals, continuing airworthiness information, and other information with respect to the subject aircraft.

32.     Venue in this District is satisfied pursuant to 28 U.S.C. § 1391, as Defendants transact business in this District.

**FACTS**

**GENERAL FACTS ABOUT AIRBUS'S BLEED AIR SYSTEM**

33.     The facts of this case highlight a previously hidden and "dirty little secret" of the airline industry: air inside Airbus's commercial aircraft can become contaminated and injure flight crew and passengers. On Defendants' commercial airplanes, outside air is pulled into the airplane's engines first and then bled off into the air system. The air breathed by flight crew and passengers thus must first pass through the aircraft's engines before entering the cabin and cockpit. This air circulation design is known as a "bleed air" system, and it allows cabin and cockpit air to become contaminated by the byproducts of heated jet engine oil, hydraulic fluid, and jet fuel that are present in the engine compartment as well as the Auxiliary Power Unit ("APU"). In fact, Airbus's design and placement of its APUs in the rear cone of its planes, currently makes its planes more susceptible to contaminated air events than other commercial aircraft (although other commercial aircraft are also susceptible to contaminated air events, just not at the rate of Airbus planes).

34.     Such events are caused by the "bleed" air system used in Airbus aircraft, which draws pre-heated, compressed air from the engine and pumps this air straight into the cabin after being cooled.

35.     Inhaling contaminated cabin air can cause both short-term or transient symptoms as well as permanent and serious personal injury. Airbus's competitor, Boeing, which also employs a bleed air system similar to that of Defendants, has admitted that the presence of toxic or noxious fumes inside the aircraft is considered "a major defect," and that the partial combustion products that are present in a contaminated air event are a "poison threat" to the flying public. For example, Boeing admits that just one of the chemicals in jet engine oil – TOCP – can cause "poisoning at extremely small concentrations," and the World Health Organization had determined "there is no safe level of consumption for humans" of TOCP. The material safety data sheets for the jet oil used in Defendants' aircraft state that there is no safe level/dosage of the mists generated by this jet oil that can be inhaled by humans.

36.     Contaminated cabin air events can also cause serious and potentially catastrophic safety issues. Defendants have known about contaminated cabin air events for decades and are aware that such events can cause pilots, flight attendants and passengers to become ill or incapacitated. Again, Defendants' competitor, Boeing, has recognized that injury or incapacitation of the pilots and flight crew can threaten the safety of every person aboard an airplane that is designed to utilize a bleed air system, and has internally acknowledged that contaminated air events could "substantially degrade flight crew awareness and performance of their duties," and that pilot incapacitation could cause a "potentially catastrophic" in-flight event.

37.     For at least the last 7 years, if not decades, Defendants have known there are technologically available, financially viable and easily implemented solutions available to remove or reduce contaminated cabin air events, including but not limited to the installation of filters in the bleed air system (known as CHOC converters), installation of APS combination HEPA /

Carbon filters in the recirculation system, as well as sensors or alarms that would inform the flight crew of a toxic event so air flow from the impacted part of the airplane could be shut off.

38.    Defendants refused to take any remedial action regarding contaminated air events on their commercial aircraft and, as such, have put lives in danger for the sake of profits. In fact, Defendants, in conjunction with other aircraft manufacturers, including Boeing, have taken actions intended to thwart or inhibit the development of remediation such as the use of sensors. They have also attempted to minimize the seriousness of contaminated air events and the injuries they cause by under-reporting the events to the public and governmental authorities, and by publicly denying that contaminated air events cause or can cause injury when they know the opposite to be the case.

39.    A bleed air system uses a network of ducts, valves and regulators to conduct medium to high pressure air, "bled" from the compressor section of the engine(s) and auxiliary power unit (APU), to various locations within the aircraft. There, the air is utilized for a number of functions, including pressurization; air conditioning; engine start; wing and engine anti-ice systems; water system pressurization; hydraulic system reservoir pressurization; and boundary layer separation enhancement.

40.    Defendants have failed to rectify their flawed and defective bleed air design. Defendants have failed to design, install, implement, or provide sensors or alarms to notify the flight crew about contaminated air events so that prompt action can be taken to reduce or minimize exposure during an event. Defendants have failed to design, implement, retrofit or install an air filter or converter into the bleed air system to remove, reduce or mitigate the toxins/harmful chemicals despite that, for decades, remedial devices have been available that can remove significant amounts of the toxins/harmful chemicals released into the air during a contaminated cabin air event. Defendants have also failed to provide adequate warnings or training about the

dangers of contaminated air events. To this day, Defendants have refused to make safety concerns about contaminated cabin air events a priority and have instead put profits over the safety of the flying public and flight crews.

41.     The use of the air for pressurization and air-conditioning is of particular importance.

42.     After leaving the engine and passing through the air-conditioning pack, where it is cooled, this bleed air is combined with recirculated cabin air before it enters the cabin. The airliner cabin is a hermetically sealed pressure vessel, with an inflow of bleed air and a computer-controlled outflow, which exhausts back to the atmosphere. Jet engines operate at extremely high temperatures. It is important to note that this bleed air is cooled but not cleaned.

43.     The bleed air system vents to the interior of the aircraft. In addition, the hydraulic pumps, and some actuators are mounted in the engines, and the bleed air is also used to pre-pressurize the hydraulic systems. The very high pressure of aircraft hydraulic systems (>10 MPa) creates "sweats," leaks, and ruptures. The overall result is that the interior air of aircraft can and does become contaminated by hydraulic fluid in addition to the engine lubricating oil and other substances.

44.     One of the fundamental problems of the Defendants' bleed air system is that all the jet engine lubricating oil and aircraft hydraulic fluid are harmful to humans with various degrees of toxicity.

45.     Air contamination can occur during normal operation of the airplane, but it is particularly high during "contaminated cabin air events" or events where additional toxins enter the air system.

46.     Defendants use a bleed air system on aircraft in United's Airbus fleet including, but not limited to the Subject Aircraft.

47.     Defendants' aircraft have repeatedly experienced contaminated air events for decades, yet Defendants have failed to eliminate or remediate the traditional pneumatic system and bleed manifold in favor of a no-bleed system whereby electrically driven compressors provide the cabin pressurization function, with fresh air brought onboard via dedicated cabin air inlets, or install CHOC systems that can prevent much of the toxic materials from entering the cabin. Moreover, Defendants have failed to warn consumers about the dangers of the "bleed" air system.

48.     Defendants' "bleed" air system has caused damage to Plaintiffs in the form of personal injury and monetary damages.

**THE INSTANT TOXIC AIR EVENT: APRIL 11, 2023**

49.     On or about April 11, 2023,[1] Plaintiffs were working on a flight from New York City's LaGuardia airport to Denver, Colorado.

50.     Upon landing in Denver, as it was approximately 80 degrees outside, the APU was turned on, and within seconds, both Ms. Fricchione and Ms. Hoff-Davis, who were in the aft of the cabin (*i.e.*, the rear or tail of the aircraft), were blasted with contaminated air.

51.     The air had a chemical smell, which Plaintiffs described as similar to WD40, but it was a smell they had never smelled before.

52.     Almost immediately, Plaintiffs began gagging and choking. There was a burning sensation in Ms. Fricchione's eyes that caused them to tear, and her skin was burning with rashes. Ms. Hoff-Davis became nauseous as well.

53.     Gasping for air and desperate, both commenced pouring water over themselves, as well as gargling water to get their airways opened.

---

[1]     Pursuant to a tolling agreement between Plaintiffs and the Airbus Defendants, the statute of limitations for filing their claims has been tolled until January 31, 2026.

54.    Plaintiff Fricchione called the Captain to tell him that something was wrong. He came back into the cabin from the cockpit, asked the cleaning personnel if they smelled anything, and they answered, "yes."

55.    There were only a few passengers on board, and most were in the front of the plane, while the smell was in the aft.

56.    Yet, Ms. Fricchione and Ms. Hoff-Davis were required to remain on the plane until the last passenger deplaned.

57.    The Captain called for wheelchairs to be brought for Ms. Fricchione and Hoff-Davis.

58.    The paramedics took both flight attendants' blood pressure and carbon monoxide levels, and both had high blood pressure levels, with both Ms. Fricchione and Ms. Hoff-Davis registering blood pressure readings near 170/90. Their carbon monoxide levels were also high.

59.    Because of their high blood pressure readings, the paramedics sent them to a walk-in clinic, and they did not continue with their scheduled work duties.

60.    Because of her high blood-pressure reading, Ms. Hoff-Davis was determined to be unfit to return to work, and she, along with Ms. Fricchione, were sent to a clinic for further evaluation and treatment, including oxygen therapy. At the clinic, an x-ray of Ms. Fricchione revealed a cloud on her lungs. However, Ms. Fricchione was approved to deadhead back to New York.

61.    As soon as Ms. Hoff-Davis landed in New York the next day, she attempted to drive to a trauma center but was not feeling right, pulled over, and fainted. She then sought emergency medical treatment in New York, where she learned that her blood pressure was still high, more than 24 hours after her exposure to contaminated air on the Subject Aircraft. Her white blood count

was also extremely high, and testing indicated that she had developed a Urinary Tract Infection.
Soon thereafter, Ms. Hoff-Davis began to develop severe headaches that have only gotten worse
over time. Plaintiff Hoff-Davis reports experiencing insomnia due to the pain from the headaches
she experiences.

62.     Testing also indicated that Ms. Fricchione had developed a Urinary Tract Infection.

63.     Soon thereafter, Ms. Fricchione also began to develop severe headaches that, over
time, have only gotten worse. They are not normal headaches, and instead, are sharp like a
thunderbolt, and they can be continuous.

64.     Ms. Fricchione experiences white spots during her headache attacks, indicative of
migraines.

65.     Ms. Fricchione also developed throat issues, as she feels unnaturally hoarse, and
her voice feels strained – a pulmonologist she saw said her throat looked like someone had opened
up a bag of chlorine and poured it down her throat as it looked sunburned from the throat cavity
on up to the head. As a result, her pulmonologist, who specializes in treating firemen who have
had chemical exposures, concluded that she had been a victim of chemical poisoning. As a result,
she was prescribed speech and other therapy to ameliorate her throat and voice issues. And even
though her throat has healed, her doctor concluded that hypersensitivity of the larynx will persist.

66.     A throat specialist diagnosed her with pharyngoesophageal dysphagia, muscle
tension dysphonia, laryngospasm and epistaxis, and confirmed that these were due to chemical
burning of the esophagus due to inhalation of chemicals.

67.     She was also referred to a cardiologist, due to her persistent high blood pressure
following her exposure to contaminated cabin air, and he indicated that, as a former military doctor,

he was familiar with chemical exposures. After doing an EKG and full exam, he concluded that what she was experiencing was consistent with chemical exposure.

68.    Ms. Fricchione has incurred neurological injuries as a result of her exposure during the contaminated event described above, which manifest as her legs cramping and twisting up like a pretzel, as well as having hand and arm cramps. She further experienced motor skill issues, and her nerves feel like bugs are crawling on her skin.

69.    She also has experienced severe fatigue since the contaminated air event and has developed Sjogren's syndrome as a result of the contaminated air event.

70.    Over the last six months she regularly wakes up with torrential bloody noses.

71.    Most importantly, Ms. Fricchione had not experienced any of the above-described symptoms and injuries until her exposure during the contaminated air event described above.

72.    Since the contaminated air event Ms. Fricchione has not gone back to work, and United has continued to pay her workers' compensation due to her incapacitation from her exposure during the contaminated air event described above.

73.    Plaintiff Fricchione has experienced short-term and long-term health effects from the above-described contaminated air event and has had to seek out extensive medical treatment for her injuries.

74.    Due to her exposure to toxic fumes from contaminated cabin air, in addition to the above-described injuries, Plaintiff Fricchione experiences problems sleeping, severe migraine headaches, memory loss, trouble concentrating, cognitive defects, emotional distress, depression, anxiety, and can no longer live the normal life she previously enjoyed.

75.    As a result of this event, Plaintiff Fricchione has also suffered loss of wages and wage-earning capacity in the past and in the future.

76.    Following the April 11, 2023 flight on the Subject Aircraft, Plaintiff Hoff-Davis also developed throat irritation and inflammation, as she feels unnaturally hoarse, and her voice feels strained. A pulmonologist similarly said her throat looked like someone had opened up a bag of chlorine and poured it down her throat because her throat cavity looked sunburned. As a result, her pulmonologist, who specializes in treating chemical exposures in firefighters, concluded that she had been a victim of chemical poisoning. She was prescribed speech and other therapy to ameliorate her throat and voice symptoms. Even though the irritation of her throat has since healed, her doctor concluded that hypersensitivity of the larynx will persist.

77.    Additionally, a throat specialist has diagnosed Plaintiff Hoff-Davis with pharyngoesophageal dysphagia, muscle tension dysphonia, laryngospasm, and epistaxis, and has confirmed that she developed these conditions due to inhalation of chemicals.

78.    Due to her persistent high blood pressure, Plaintiff Hoff-Davis was referred to a cardiologist. After doing an EKG and full examination of her, he concluded that what she was experiencing was consistent with chemical exposure.

79.    Plaintiff Hoff-Davis has also incurred neurological injuries as a result of her exposure during the April 11, 2023 contaminated air event on the Subject Aircraft, having experienced symptoms including leg, hand, and arm cramps and motor skill issues.

80.    Plaintiff Hoff-Davis also has experienced severe fatigue since the April 11, 2023 contaminated air event on the Subject Aircraft, and a rheumatologist has diagnosed her with Sjogren's syndrome as a result of the contaminated air event.

81.    Most importantly, Plaintiff Hoff-Davis did not experience any of the above-described symptoms and injuries until her exposure to contaminated air in the cabin of the Subject Aircraft during the April 11, 2023 contaminated air event described above.

82.    Since the April 11, 2023 contaminated air event, Plaintiff Hoff-Davis has not been able to return to work, and United Airlines has continued to pay her workers' compensation due to her incapacitation.

83.    Plaintiff Hoff-Davis has experienced short-term and long-term health effects from the above-described contaminated air event and has had to seek out extensive medical treatment for her injuries.

84.    Due to her exposure to contaminated cabin air, in addition to the above-described injuries, Plaintiff Hoff-Davis has problems sleeping, memory loss, trouble concentrating, cognitive defects, emotional distress, depression, anxiety, and can no longer live the normal life she previously enjoyed.

85.    As a result of this event, Plaintiff Hoff-Davis has also suffered loss of wages and wage-earning capacity in the past and in the future.

86.    A better alternative design for the aircraft exists. The bleed air system, while common, is not the only available system for the design and manufacture of aircraft.

87.    In 2004, Boeing launched the Boeing 787 Dreamliner, a commercial aircraft that does not use a bleed air system. The Dreamliner air system eliminates the risk of engine oil decomposition products being introduced in the cabin air supply.

88.    One of the reasons Boeing developed the bleed-free air supply system on the Dreamliner was to eliminate "engine contaminants potentially entering cabin air supply- Improved Air Quality."

89.    Additionally, airplanes currently manufactured by Defendants could be modified to lessen and/or eliminate the risk of contaminated air events entirely without placing an undue burden on the manufacturer through the use of CHOC converters as well as the installation of air

sensors and/or alarms in the cabin, so that if an event takes place, the pilots and crew can take remedial measures.

## THE HISTORY OF AIRBUS'S LIABILITY

90.     Airbus employs more than 140,000 people and, along with Boeing, is one of the world's largest commercial airliner manufacturers.

91.     The problems with the bleed air system were already known for several decades when Airbus commenced production of commercial aircraft in the 1970s.

92.     Thus, since its inception, Airbus knew (or should have known) that contaminated cabin air events do occur in all aircraft utilizing bleed air systems, that they are foreseeable, and can cause serious danger to the health and welfare of crew members and passengers. And well prior to the contaminated air event described above, Defendants have been aware that their bleed air system airplanes are unreasonably dangerous and can cause significant acute and permanent injuries to flight crew and passengers.

93.     As early as 1953, the airline industry (primarily Boeing and its predecessor McDonnell Douglas) knew the bleed air system was "increasingly subject to unacceptable contamination" and that a decontamination or filter unit was needed to "purify engine bleed air to the point where it is suitable for cabin air conditioning." As such, once Airbus began manufacturing commercial aircraft in the 1970s, it necessarily was aware of this problem, yet it chose to adopt and use this unreasonably dangerous bleed air system. Yet, to date, Airbus has still not designed, created, implemented, retrofitted or added a filter or converter to the air circulation system of the aircraft that can safely and effectively protect crew members and passengers from contaminated air events.

94.     The Subject Aircraft was initially designed, manufactured, and assembled by Airbus S.A.S. Air cabin contamination does not affect everyone to the same degree, and some people are physiologically more susceptible to injury from even trace amounts of contaminants.

95.     It is established that flight crews, because of their increased in-flight activity, have an increased in-flight breathing and metabolic rate, which makes them more susceptible to injury from contaminated air events.

96.     Toxic cabin air events occur on every type and model of Airbus planes that employ the bleed air system of cabin ventilation.

97.     As Airbus knows, contaminated air events occur every day.

98.     In 2004, Boeing launched the Boeing 787 Dreamliner, a commercial aircraft that does not use a bleed air system. The Dreamliner air system eliminates the risk of engine oil decomposition products being introduced in the cabin air supply. One of the reasons Boeing developed a new air supply system for the Dreamliner was to eliminate "engine contaminants potentially entering cabin air supply" and to improve air quality.

99.     Under the rubric of "hear no evil see no evil," Airbus has failed to adequately and sufficiently investigate, study, identify, and even quantify the toxins present in aircraft cabins during a contaminated air event.

100.    All in-flight air samples taken to date capture only normal flight operations. And even that data is alarming: the dangerous neurotoxin tricresyl phosphate (TCP) has been found on airplanes during even routine operation. Independent researchers confirm that, when cabin air was tested even under normal flying conditions, "significant concentrations of organophosphate neurotoxins and other noxious substances in cabin air" were found. In 2009, when investigative

reporters secretly took wipe samples from inside a number of airplanes, all under normal operations, "out of 31 samples, 28 were found positive for TCP."

101.    **Failure to Implement Converters**: Airbus failed to develop, install, or implement filters or converters on the Subject Aircraft. Feasible and effective filters and converters, which could remove or significantly reduce airborne toxins, have been available. The most well-tested of these is the Combined Hydrocarbon Ozone Converters (CHOC), which Airbus could have, and should have, installed on all Airbus aircraft that utilize a bleed air system. CHOC converters function similarly to a filter, except the CHOC captures the vast majority of toxic contaminants and converts those chemicals into more benign compounds. CHOCs are effective at reducing contaminants present in contaminated air, thus making the bleed air system safer for passengers and crew.

102.    Adding CHOCs to Airbus planes would be easy, as the CHOC unit fits into "the same envelope space as the ozone converter[,]" and is essentially a drop-in replacement for the ozone converter, while providing design advancement "at little to no extra cost." The CHOC has the same durable, lightweight design and same long-lasting, high-efficiency as the currently utilized ozone converter.

103.    Yet, Airbus consistently and repeatedly refused to allocate adequate resources for the research, development, and installation of either converters or sensors to detect contaminated air.

104.    **Failure to Implement Combination Recirculation System Filters**: For the 787 Dreamliner, Boeing helped create the APS filter: a combination HEPA and carbon filter that can remove both biologics and viruses as well as Volatile Organic Compound contaminants. During the relevant time frame for this lawsuit, Airbus never installed, offered, required or recommended

this technology on its bleed air supply aircraft even though the APS filter was technologically available, financially feasible, effective and safer.

105. **Failure to Implement Sensors**: Airbus failed to design, install, or implement sensors. Airbus airplanes already have numerous sensors onboard, many of which trigger warnings for the pilots in-flight. Yet, Airbus has never installed a sensor to warn of a contaminated air event.

106. A pilot's ability to detect a contaminated air event in-flight is critical. In the cockpit, there is a simple switch that allows the pilot to shut off inflowing air from either engine with no functional effect to the aircraft. If the pilot knew contaminants were entering the air supply from a specific engine, with just a flip of a switch, the pilot could shut down the air flow from that engine and protect passengers and crew from inhaling the toxins.

107. While pilots have access to pure oxygen masks in the cockpit and are trained to don those masks during contaminated air events to reduce the risk of incapacitation, there is no such protection for passengers and flight attendants. The masks that fall from the overhead compartment in the cabin allow for only 4-15 minutes of oxygen. Sensors are thus an important tool to provide an early warning to pilots so that they can block the contaminated air from entering the cabin.

108. Pilots want sensors on airplanes, as they consider contaminated air events to be "safety" issues and do not want "passengers used as guinea pigs in seats." The Airline Pilots Association notes that the development and installation of sensors for guarding against toxic cabin air events is "[t]he single most important safety item" for pilots.

109. The flight crew unions also want sensors. The FAA wants sensors. Industry organizations such as ASHRAE have demanded sensors. Independent scholarly organizations like the National Research Council recommend sensors.

110.    Although many sensors have been developed and approved for use inflight, Airbus steadfastly refuses to install them. One obvious reason for Airbus's reticence is that Airbus fears the information captured by those sensors. Thus, to protect itself from litigation or acceptance of responsibility for its actions, Airbus is willing to risk the safety of passengers and flight crew.

111.    Airbus has long known that its bleed air system is defectively designed. Airbus is aware that cost-effective safety measures exist or could be developed to mitigate or eliminate the danger.

112.    Airbus has ample resources to investigate, research, develop, and implement safer alternatives. Despite these resources, the Airbus Aircraft at issue here had a defectively designed bleed air system, was not equipped with appropriate converters or filters to remove air contaminants, and did not have a sensor to warn the flight crew.

113.    Further, Airbus has provided the flight crews with little or inadequate training on how to handle a contaminated air incident or how to isolate the source of the air contamination so such contamination could be reduced, avoided, or stopped.

114.    Airbus knew that cabin air could become contaminated, knew that such contamination could cause health problems, and knew that technologically available and economically feasible safer alternatives existed. Yet, Airbus did not redesign or retrofit the subject aircraft to eliminate or reduce these hazardous events.

115.    Because of Airbus's decisions, Plaintiffs and others were exposed to contaminated bleed air, the environmental control system on the Subject Aircraft lacked converters or filters that would have reduced or eliminated the presence of the toxic fumes in the cabin, and there was no sensor or warning on the Subject Aircraft to warn the flight crew so remedial action could be

implemented by the flight crew. Further, Plaintiffs were not properly warned of the health dangers of contaminated cabin air and were ill-equipped to respond to this incident.

116.    Airbus knew of the defects in the Subject Aircraft, knew that because of such defects, the cabin air on the Aircraft was not free from harmful or hazardous concentrations of contaminants, was on notice that the Aircraft defects were likely to cause injury yet failed to adequately warn or instruct on the Aircraft defects, failed to remedy the known defect in the Subject Aircraft, failed to discover the dangerous conditions when such could have been discovered, and/or failed to take affirmative action to avoid injury to Plaintiffs and others.

117.    Recently, it was publicly announced and reported that the Airbus Defendants, at the request of Delta Airlines, have commenced retrofitting all of the APUs in the A320 aircraft operated by Delta Airlines to address and ameliorate the problems, as alleged herein, caused by their bleed air systems on their A320 family of planes. See, "Delta To Replace APUs on Airbus Jets in Wake of Toxic Fume Issues" (https://simpleflying.com/delta-replace-apu-airbus-jets-toxic-fume-issues/), "Delta Replacing APUs to Stop Engine Fume Injuries" (https://avbrief.com/delta-replacing-a320-apus-to-stop-fume-injuries/), and "Delta Replaces Engine Units in Effort to Address Toxic-Fume Surge on Plane" (https://www.wsj.com/business/airlines/delta-airlines-engine-unit-replacement-fumes-0bfae0aa?reflink=desktopwebshare_permalink) (Wall Street Journal noting that "Such Incidents have led to brain injuries for crew and passengers, The Wall Street Journal reported recently").

118.    In one of the articles, Dr. Robert Harrison, who has treated more than 100 crew members for such exposures noted that breathing this contaminated air can lead to nervous system injuries. This was confirmed in another article that quoted Dr. Robert Kaniecki, a neurologist, who

has treated over 100 flight attendants and a dozen pilots for brain injuries due to these events, some of which were permanent.

119.    The articles also noted that the recent surge of these events has been largely linked to Airbus jets.

## COUNT I: NEGLIGENCE

120.    Plaintiffs re-allege all previous paragraphs as if set forth herein verbatim.

121.    At all times relevant hereto, Airbus owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, retrofitting, selling, marketing, promoting, and providing warnings or instructions about the Subject Aircraft so as not to cause Plaintiffs personal injuries and pain and suffering.

122.    Airbus negligently breached its duty of care owed to the Plaintiffs through one or more of the following negligent acts and omissions, when Airbus:

   a.    Negligently designed, manufactured, assembled, and sold the Subject Aircraft such that its ventilation system allowed contaminated bleed air to enter the breathing air zones in the aircraft;

   b.    Negligently designed, manufactured, assembled, and sold the Subject Aircraft without an adequate or appropriate air quality monitor, sensor, or alarm to detect bleed air contamination, to allow the flight crew to identify the source of such contamination and/or permit the flight crew to mitigate, reduce, or prevent contamination events;

   c.    Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate or appropriate converters or filters to protect cabin air from contamination;

d. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposures to such contaminated air;

e. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate study or information regarding the chemical composition of heated aviation jet engine lubricating oil or hydraulic fluid or the pyrolyzed byproducts of such as well as the toxicity of these toxins;

f. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate study or information regarding what chemicals or byproducts are created when aviation jet engine lubricating oil or hydraulic fluid is heated to temperatures consistent with those experienced in the engines;

g. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without properly testing heated aviation jet engine lubricating oil or hydraulic fluid to fully understand the toxic chemicals and byproducts of such;

h. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without knowing the quality of the bleed cabin air;

i. Negligently failed to incorporate a proper and effective environmental control system or air supply on the Subject Aircraft;

j. Negligently failed to properly test the Subject Aircraft before selling or distributing it;

k.  Negligently failed to adequately maintain, service, retrofit, and/or inspect the Subject Aircraft or add the needed safer alternatives;

l.  Negligently represented, promoted, and marketed its Aircraft as being safe and failed to provide adequate warnings and instructions about its Aircraft; and

m.  Was otherwise negligent and careless.

123.  Airbus owed a duty to adequately warn and instruct about the dangers of its Aircraft, which it knew, or, in the exercise of ordinary care, should have known, at the time the Subject Aircraft left Airbus's control.

124.  Airbus negligently failed to warn of the defective and unreasonably dangerous conditions of the Subject Aircraft.

125.  Airbus misrepresented the safety of its Aircraft and the dangers of air cabin contamination.

126.  As a direct and proximate result of Airbus's negligence, Plaintiffs suffered, and continue to suffer, acute and chronic health effects from their exposure to contaminated cabin air, and Plaintiffs claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to, medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

## COUNT II: NEGLIGENT DESIGN

127.  Plaintiffs re-allege all previous paragraphs as if set forth herein verbatim.

128.  Airbus is the product manufacturer of the Subject Aircraft.

129.  At the time Airbus manufactured the Subject Aircraft, the Subject Aircraft was negligently designed and not reasonably safe because:

       a.      It was unsafe to an extent beyond that which would be contemplated by the ordinary consumer; and

       b.      The likelihood the Subject Aircraft would cause Plaintiff's harm, or similar harms, and the seriousness of those harms, outweighed Airbus's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have on the product's usefulness.

130.    At the time Airbus manufactured the Subject Aircraft, the Subject Aircraft was negligently designed and not reasonably safe in construction in the following respects:

       a.      The Subject Aircraft's ventilation system allowed bleed air, which can become contaminated with dangerous toxins, to enter the cabin and cockpit air;

       b.      The Subject Aircraft lacked adequate air quality monitors, sensors or alarms;

       c.      The Subject Aircraft provided no safeguards or systems so the flight crew could identify the source of the contaminated air or mitigate or prevent contamination of the cabin air; and

       d.      The Subject Aircraft lacked adequate or appropriate converters or filters to reduce, remove, or eliminate bleed air contamination.

131.    By reason of the foregoing, the Subject Aircraft was unreasonably dangerous and defective, and Airbus is liable for the damages sustained by Plaintiffs as a result.

132.    As a direct and proximate result, Plaintiffs suffered, and continue to suffer, acute and chronic health effects from their exposure to contaminated cabin air, and they claim damages

for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

## COUNT III: NEGLIGENT FAILURE TO WARN

133.    Plaintiffs re-allege all previous paragraphs as if set forth herein verbatim.

134.    Airbus is the product manufacturer of the Subject Aircraft.

135.    At the time Airbus manufactured the Subject Aircraft, the likelihood that the Subject Aircraft would cause Plaintiffs' harms or similar harms, and the seriousness of those harms, rendered any warnings or instructions of Airbus inadequate, and Airbus could have provided warnings or instructions relating to the risks and dangers set forth herein.

136.    Following Airbus's manufacturing of the Subject Aircraft, Airbus learned or reasonably should have learned about the risks and dangers set forth herein, and Airbus had a duty to act with regard to issuing warnings or instructions relating to such risks and dangers.

137.    Airbus failed to adequately warn of the danger of toxic cabin air and/or failed to adequately instruct on the proper use of its Aircraft to avoid cabin air contamination in one or more of the following respects:

a.    The Subject Aircraft lacked proper warnings regarding the potential of the air supply system to become contaminated;

b.    The Subject Aircraft lacked proper warnings regarding the identification or detection of contaminated air;

c.    The Subject Aircraft lacked proper warnings regarding the health dangers of exposure to contaminated air; and

d.    Airbus failed to adequately warn or instruct on how to respond, contain, or reduce the danger of contaminated air events.

138.    By reason of the foregoing, the Subject Aircraft was unreasonably dangerous and defective, and Airbus is strictly liable for the damages sustained by the Plaintiffs.

139.    As a direct and proximate result, Plaintiffs suffered, and continue to suffer, acute and chronic health effects from their exposure to contaminated cabin air, and they claim damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

### PRAYER FOR PUNITIVE DAMAGES

140.    Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

141.    Airbus's actions related to contaminated air events on its aircraft and the Subject Aircraft equate to knowing or willful and wanton negligence, in conscious disregard of Plaintiffs' rights, or with reckless indifference to consequence. Airbus was aware, from its knowledge of the existing circumstances and conditions of its bleed air system, that its conduct and failure to act would cause injury to Plaintiffs or others.

142.    Airbus's knowing or willful and wanton conduct includes, but is not limited to, all facts and issues discussed above as well as:

      a.    Airbus is aware that contaminated air events occur on its bleed air system aircraft and that contaminated air events cause health and safety issues. Airbus acknowledges that flight crew experience real symptoms from contaminated air events. Despite a mountain of scientific and medical evidence demonstrating the health and safety concerns associated with contaminated air events, Airbus has not taken any meaningful steps to correct these problems. Airbus has never captured, documented, evaluated, assessed, or analyzed a contaminated air incident in-flight. Airbus cannot

tell the public what toxins are even present during a contaminated air event or at what levels. Airbus's typical investigation of a contaminated air event involves examining the plane hours or days after the event, by which time the air (and its contaminants) has cleared. This failure to act and evaluate the toxic chemicals Airbus knows are present in its aircraft during contaminated air events is willful and wanton behavior and independently provides a sufficient basis for punitive damages, *i.e.*, Airbus knows it is exposing flight crew and passengers various levels of poisonous and toxic contaminated air but has not appropriately assessed the issue to identify the type or amount of toxins present or the varying adverse health effects of such contaminants on passengers and flight crew.

b.    Airbus deliberately chose and continues to choose not to implement safer alternatives. Feasible and effective filters and converters, which would remove or significantly reduce airborne toxins, have been available for almost two decades. Airbus knows that Combined Hydrocarbon Ozone Converters (CHOC) converters reduce the adverse effects of contaminated air events and show efficacy rates as high as 60-90%. Implementing CHOC converters into Airbus airplanes would be simple, as the CHOC slides right into the same slot in the bleed air system as the existing ozone converter. Yet, Airbus management has deliberately blocked testing and implementation of CHOCs, repeatedly putting funding obstacles in the path of its air quality team. Airbus's decision to still not adopt or implement safer

alternative converters is knowing or willful and wanton behavior and independently provides a sufficient basis for punitive damages.

c.    Airbus deliberately chose, and continues to choose, not to implement sensors in its air system that would alarm and warn pilots about contaminated air events. With such knowledge, pilots could stop the flow of contaminated air into the cabin and cockpit and avert further injury.

143.    Airbus's conduct is knowing, egregious, willful, wanton, reckless, and worthy of punishment.

144.    Airbus acted in a manner of actual and constructive consciousness that injury would result from the acts done or omitted as described above.

145.    As a result of Airbus's willful and wanton neglect, each Plaintiff was injured and seeks punitive damages against Airbus.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the entry of a judgment in their favor and against Defendants, together with costs, attorney fees and such other damages as may be allowed by law, including pre- and post-judgment interest, in amounts to be proven at trial of no less than $30,000,000.00 each.


Dated: January 26, 2026                 Respectfully submitted,

                                        **GREENBAUM OLBRANTZ LLP**
                                        */s/ Casey J. Olbrantz*
                                        Casey J. Olbrantz
                                        Carter E. Greenbaum
                                        244 Fifth Avenue, Suite C221
                                        New York, New York, 10001
                                        646-818-0913
                                        casey@greenbaumolbrantz.com
                                        carter@greenbaumolbrantz.com

**HART McLAUGHLIN & ELDRIDGE, LLC**
Steven Hart, Esq. (*PHV forthcoming*)
Stewart Weltman, Esq. (*PHV forthcoming*)
Paige Smith, Esq. (*PHV forthcoming*)
1 South Dearborn Street, Suite 1400
Chicago, IL 60603
(312) 955-0545
shart@hmelegal.com
sweltman@hmelegal.com
psmith@hmelegal.com

**BURNS CHAREST LLP**
Warren Burns, Esq. (*PHV forthcoming*)
Martin Barrie, Esq. (*PHV forthcoming*)
Ian Baize, Esq. (*PHV forthcoming*)
900 Jackson Street, Suite 500
Dallas, TX 75202
(469) 904-4550
wburns@burnscharest.com
mbarrie@burnscharest.com
ibaize@burnscharest.com

*Counsel for Plaintiffs*